We have four defendants arguing and one government attorney. I am going to keep it to the traditional format. That is, I will have each of the defendants argue, then give the government a substantial amount of time to deal with all the issues, and then turn to the defendants' attorneys for rebuttal, which each one of them has requested. Let's start with Jonathan Delgado. It's good afternoon, Your Honor. Good afternoon. Shall I start? Yes, please. May it please the Court, I am Scott Green, attorney for defendant Jonathan Delgado. I would like to start with the sentencing issue that we raised, that the sentence of life violated the Eighth Amendment. Jonathan Delgado was 17 years old at the time of the commission of the incidents that led to the special sentencing factors in Count 1, the RICO conspiracy. He was 26 years of age at the time of his sentencing. The court, using the special sentencing factors and viewing the guidelines, the advisory guidelines, found that he had a sentencing range of life. The district court indicated during the sentence that it carefully considered the submissions of the parties and also considered the sentencing factors contained in 18 U.S.C. 3553A. Uncle, this is Ms. Brewer. Did you cite Miller v. Alabama to the district court? At the time of sentencing, no. For the appeal, yes. Now, while Miller, the district court in its sentencing went on to recite the two incidents that occurred before my client's 18th birthday as reasons to impose the life sentence. At the time of sentencing, there was no mention of the defendant's age or the impact his youth may have had upon reaching a just sentence. Mr. Green? Yes, Your Honor. This is Judge Carney. Do you agree that our circuit has not yet addressed the question whether Miller applies to discretionary life without parole sentences such as what's imposed on your client? We've addressed mandatory, and Miller addresses mandatory, but the Malvo case, of course, was dismissed in the Supreme Court after Virginia changed its law. So do you agree that this is kind of an open question in our circuit whether the district court needs explicitly to consider incorrigibility and the other Miller factors in the discretionary scheme? Judge, it is an open question, and listening to the Malvo argument, the Supreme Court felt it to be an open question. But I also cite Montgomery v. Louisiana, and I think that decision tips to the need for the district court to talk more about the youth of the individual. I am not saying that Miller is on all fours. Certainly, it is not because that was a mandatory life without parole situation. But frankly, it's a distinction without a difference because in this particular case, Mr. Delgado is receiving life and will not be paroled based upon his convictions. Life plus five years, actually. Yes, even more so. You're correct, Your Honor. I would submit to the court that because the district court failed to look into the history of my client, as Miller had said, it's the rare juvenile offender whose crime reflects irreparable corruption who should receive the life sentence. But here, the record is silent. And although I concede that the judge said he reviewed the 3553A factors, this is the kind of incident or the sentence that really needs to consider factors as well. Excuse me. This is Judge Jacobs. Yes, Judge. If the judge considered, as the judge did, 3553A factors, what is left out of those considerations that would bear upon the sentencing of a person who was a mere teenager at the time of the offense? Well, Judge Jacobs, I would submit that the mere incantation of, I have considered the factors, is not enough for a juvenile here, especially when the court takes pains to cite the crimes that the defendant committed as a juvenile for his basis, excuse me, to impose the life sentence. So on the one hand, I agree it sounds as if it was covered. But on the other hand, as you listen to the words, I submit it wasn't. And I would submit to the court that it is unclear and that a new sentence should be returned so that the judge, the district court, can make it clear that it has considered these factors as well. Would you say that incorrigibility, which is one of the factors that Miller Court identified as particularly important in the context of sentencing someone who was a juvenile when the crime was committed, that that is encompassed by the 3553A factors or that it is a kind of special subset of those factors? The latter, Your Honor. It's a special subset. We're dealing with, as the court recognizes and the Supreme Court recognizes, we have a certain class of person involved in this sentencing. In this particular case, a juvenile. So I would submit to the court that something more than just a mere incantation is required so that this court and other appellate courts can be assured that these factors were taken into consideration. As I review the sentencing of the district court, no one could be sure. And therefore, I believe that a sentence, the court should, the case should be returned to the court for sentencing. Are there elements that you would point us to in your client's past that suggest the opposite of incorrigibility, that there might be a reason to allow for the possibility of parole at some point, however far off in the future? Certainly, Judge. Not parole, but release. Yeah. Understood. He was 26 at the time that he was sentenced. We had submissions from family and friends indicating that he was, he's been helpful. He was working in the community. He was going along, getting a profession. Things, and also it should be noted that the last incident involving my client in this conspiracy, which was an 11-year conspiracy, he was 18, maybe turned 19, the last time that any incident involved in a conspiracy alleged his activity. So for a good four and a half to five years, he was out of the game. And I say that understanding that when it comes to the conspiracy laws, you basically don't get out of the game unless you affirmatively get out of the game. But his lack of involvement in the gang for four to five years, I think also reflects that he was a changed individual. And that's something that was not considered. Thank you, counsel. You have reserved one minute for rebuttal. We'll hear next from the next defendant. And that is Matthew Smith, represented by Jane Myers. Is that correct? Yes, that's correct. May it please the court. This is Jane Myers. I am going to start out by arguing, well, actually, I think I'll simply, unless the court has questions, argue point one of my brief. Our position is that the evidence was legally insufficient to establish Mr. Smith's guilt of the third and fourth counts of the indictment. Either two branches of what my argument was. In order to be guilty under Section 1959A1, it has to show that the individual defendant, when he's acting to aid the other people, and we don't contest that my client in fact did aid the other people, but to have him guilty of the murder count, he has to share the mental culpability established by New York law for the offense. And that is, in fact, intentionally acting so as to cause the death of the 7th Street gang members. And that's made clear both in the language of Article 20 of the Penal Law of New York in the section itself, 125.25, which is murder in the second degree. And it's also made clear in the definition of intentional within the subdivision or within the statute of 15.05. While there is, in fact, evidence that my client certainly was not a nice, friendly guy and he was looking for some harm to befall the 7th Street gang members, there's absolutely no evidence in this case that he specifically thought that these people be murdered. And there are no- What about the language where he said, they are out there, do what you gotta do? He said that to Reyes? Yeah, he did, in fact, according to the evidence, say that. To me, that did not show that he specifically intended their death. It shows to me, and I think it's the only reasonable jury inference that could have been drawn, is that he was basically saying, this is up to you, do whatever you're going to do, and leaving it to them. But after what he said, they got what they deserved. But he didn't even really know what happened at that point. A, he wasn't there. B, the wrong people. I mean, he ended up killing horribly innocent bystanders. Well, they certainly didn't deserve what they got. No, certainly, but- So he was probably talking about the gang members. Yeah, but he did not know they were, at that point, killed. They didn't know that he was- he didn't know that they were dead. And that's actually consistent with all of the circumstances that led up to the shooting itself, because when my client went into the park, he isn't talking, he isn't saying, let's do this. And frankly, no one else is at this point. They're talking generally about, we want to retaliate for Kiki, you know, because Kiki had been killed. That's it. My client did not go to- And what did retaliation mean, except shooting the other gang? Yeah, I don't know, but it has to be retaliation in kind. There's nothing to indicate that more than anything else. In addition to that, when he gets to Sam Thurman's house, he is basically a latecomer. The other people have already seen the weapons. He's wondering what is going on at that particular point. So he clearly doesn't even know precisely what is happening. Then when he leaves, he doesn't go, you know, and hang out with the weapons and with the commit the murder. He goes around with two of his pals to some teen club where they get kicked out of and to another social place. I mean, there's nothing that indicates that he was either knowledgeable at the planning or that he participated in it in any way. He just socialized at this point. And as you know, my point is basically that when he says, do what you have to do, he's basically leaving whatever was going to happen for others to decide. And where the government comes along, it makes me sure rational, though, in light of the inferences we need to draw in support of the jury verdict. You need to tell us why it's irrational for the jury to have inferred the intent that they did. And on the record in front of me, I can't see that it was at all irrational in light of his reference to retaliation, in light of the ongoing practices of the gang and so on. What about the evidence before the jury makes it irrational for them to have concluded that he had the requisite intent? You see, I think that we have a whole bunch of circumstances. And even if you consider them cumulatively, one upon another upon another does not in this particular case, we would say, let someone draw the inference that death was what he wanted. Was there any reason to believe, for example, that he did not see the guns laid out on the bed? There is a good reason to see that. I do believe that the record shows that he came in after the others had seen them. And there's nothing to indicate that he, in fact, saw them. I think that there was testimony that everyone was talking about what was going on and they were laid out in the open and people were handling them and trying to figure out who was going to use what. It's hard for me to think he would have been insulated from that. Perhaps I am misremembering something from the record, but I don't actually think I am. I think that the testimony was that he came in after this whole, who's using what? Here are the weapons on the bed. He wasn't there when that happened. He came in afterwards. And so for that, yeah. And turning now to my second part of that point, I also, my client also takes the position that the evidence was legally insufficient to show that Smith acted for, you know, for maintaining or increasing his position within the gang. And that's actually a pretty, you know, simple argument on this. We absolutely recognize that it doesn't have to be that he had the sole intent to do it. It could just be, you know, one of many things. But here, there was absolutely nothing for that. I mean, we concede also that you're required to be a member of the gang to, quote, put in work. However, other than fighting, which everybody is supposed to do, and apparently everybody did do, this is pretty much a case where the people in this gang chose their own particular roles. It's not a particularly hierarchical structure. Some people did this. Some people did that. In fact, many of the gang members were not participating in the shooting that occurred on that day at all. They had nothing to do with it, even though they were around. So it's not as if everybody was required to do everything. And Mr. Smith was already in quite a senior position for this particular gang. In addition to that, in terms of increasing his stature within the gang, this gang was sort of so loose that there was absolutely no testimony indicating what one could or might have done to do that. For all of those reasons, we ask you to find that the evidence for the counts three and four was legally insufficient. Thank you, counsel. You have reserved 10 minutes for rebuttal. So I will come back to you at that appropriate time. Thank you, Your Honor. We will hear now from the attorney for Ismael Lopez. Yes. Good afternoon, Your Honor. Maurice Furillo, appearing for Mr. Lopez. My first point deals with the insufficiency of evidence in this case as it relates to Mr. Lopez. The first dealing with the Vicar charge, we contend in our brief lays out a lack of knowledge and lack of intent to murder individuals on April 17th. The Popola and the Fisher case deal with the specific intent to aid and abet murder and willful intention. There's a number of issues we raise as far as the evidence of things that would be obvious that were not shown. The 7th Street people that were there did not identify his car or the vehicle, which was a bright red Ford Explorer. Cooperating witnesses generally said Lopez arrived at the apartment complex. There were no discussions not involved in planning. He denies any involvement. I just want to be clear up front. But those were the allegations. Those were the testimony. I know the government relies on Corchado Jameson, what he allegedly said in the vehicle, but that was not confirmed by any other individuals. And when I referred in the record, there were no discussions about intended. Also, how to get this is just cool. Yes, Mr. Lopez drive four of the shooters to the scene for the purpose of carrying out the murders. Well, I would say that's not what the the evidence would show that he even assuming that he drove, you still have to deal with the intent to murder. I did cite various cases on that in New York state law, which which is a very high level. And you're driving an individual to a scene is not equivalent to that. I cited comfort in some other cases. Again, substantive law. We're dealing with New York state provisions, and I would submit they were not satisfied with respect to that. So that would be my point as it relates to the Vicar charge. So you don't deny that he drove the shooters, but you are arguing that he didn't have the intent. Well, I'm saying we do deny that he was driving. He's denied it consistently that he had any involvement. I'm just assuming for purposes of the Jackson analysis in terms of what we're looking at, even assuming that he drove, that would be insufficient. And I did cite various cases, comforts, other cases. There's only one that Jacobs go ahead. There's also testimony that that he asked the shooters not to shoot from his truck, in which case the jury could conclude that he knew that a bunch of people were going to be shooting. He just was worried about, you know, damaged his truck. There was one one individual that said that he also said in earlier testimony on page 2221, there was no discussion about intended activity, just how to get there. So Mr. Jameson had inconsistent testimony about that. But I I'm aware of the quote that the government lies on. But none of the other parties that testified in the vehicle said that, which I think testimony that not only were they armed, but that the one of them had a shotgun and put it down right on the on the back seat of the of the truck. So it's pretty hard not to see that. Well, well, I guess what you're saying is that you have a different version, a different  But we, of course, have to look and see why it was irrational for the jury to conclude what they did. Well, there was some concealment, I think, in the testimony as well, and that he allegedly drove up and they went into the vehicle and dropped them off. But again, I think with respect to the intent of murder, which is very high standard in that, I don't think that portion has been proven. The other point is dealing with promotion of an interest in this group. There was testimony from Mr. Egan, for example, of multiple shootings, multiple criminal activities. My client wasn't found to be involved in any of that. He was involved in college working at DMV, etc. So I don't think that element was established as well with regard to the biker charge as far as promoting or maintaining a position in this group. So I think that also was not established as a part of the element. I've also raised things, elements related to the 924C, that the government failed to show a nexus between the alleged possession of the firearm and any drug activity. We've also raised issues on the drug conspiracy, sufficiency of that and the RICO conspiracy, which are laid out. There was no, for example, insufficiency to establish a pattern of racketeering activity by my client. So I think all those elements were not satisfied. I also want to point out to the court, I know there's a number of points I've raised in the brief. The issue of the sentence that Mr. Lopez received, again, my client denies the charges, but for sake of discussion, the biker charge, which has a mandatory life sentence, I'm very familiar with the Sierra case and so forth, but I think I still have the right and the particular facts of this case to say that that sentence was harsh and excessive for my client, both in terms of the Eighth Amendment and also the 3553 factors. My client indicated in the sentencing, today I'm facing life in prison at the death sentence and obviously that's reality because if he's given a life sentence, he has no possibility of parole. I've provided, I think, very compelling letters of recommendation, et cetera, which showed his honors in school, accomplishments in work, caring for his elderly parents. So I wanted the court to be aware of that particular request that the court considered the sentencing and the what we would contend is excessive sentence. I did cite the Cruz case, which Judge Hall gave some very extensive analysis and reasoning for her departure on a biker case. So I did want to point that out. The court's very familiar with the sentencing commission and their findings about maturity and that some individuals don't gain reasoning skills and abilities until the age of 25. And I know the court's aware of all the cases that have been cited in support of that. So the court is aware of that. So I would indicate, I'd ask the court to consider those factors relative to sentencing in this particular case. I'd also point out that on the point three, I did raise some issues with respect to the Rule 33 motion in the interest of justice. We'd attached some statements from Mr. Hill and Mr. Yancey, which we would contend would give the court basis to give a new trial. There was a reference to the outbursts of a family member during the trial, which was very inflammatory. The government had made some what I would submit inflammatory comments referring to the defendants as hyenas and execution team. Under all those factors, I think that the short deliberation period was of the jury actually deliberating was consistent with prejudice to my client. So I thank you, counsel. Thank you. You have reserved three minutes for rebuttal. The next and last defendant is Domenico Anastasio. We'll hear from counsel. Thank you, Your Honor. This is a Peter Tamayo on behalf of Mr. Anastasio. Your Honor, Mr. Anastasio is facing the mandatory life sentence for a crime that he did not and could not have committed, namely murder in aid of racketeering. The record shows that Mr. Anastasio did not commit the offense from which that judgment is based. It is undisputed that Mr. Anastasio was not one of the shooters, and the record shows that he did not aid in the bet in committing that crime. Now, the government argues that he prepared a .44 revolver for use in the crime, but the record does not support their argument. Delgado and Foxworth were the ones who worked on the .44 revolver because it was defective, not Anastasio. And years later, when Mr. Anastasio was questioned about what happened in the apartment, he testified only that he recalled seeing the revolver with one bullet in it. Mr. Tamayo, this is Judge Carney. Could I ask a question, please? Am I correct that there's no record evidence suggesting that Defendant Harville actually was able to fire a bullet from the .44 firearm that he took from your client? Well, Your Honor, the record goes further than that. It's inoperable, right? He says twice. Harville, he says the bullet did not fire, and then later he talks about the bullet still being in the gun when he brought it back, and that he was actually embarrassed that the gun had not fired. So that's the second reason that he could not have committed the crime, because Harville did not shoot anybody. And so Harville might have been tried for attempted murder, or your client might have been liable as an accessory to an attempt, possibly, by handling the gun. Is that right? That's right, Your Honor, but under Vicar, the accessory or aiding and abetting or even not mandatory life. Mandatory life is reserved specifically for murder, as well it should be. But here there is no murder. And under federal law and under state law, there has to be a death in order for there to be a murder. Anything else is an attempt, which is not what he was convicted on and what he was sentenced on. And, Your Honor, that extends not only to those substantive offenses, the Vicar murders, but to the conspiracy as well, because the conspiracy, the guideline calculation for the conspiracy, assumed the murders. Those were factors which the sentencing judge found, and they were not supported by the evidence. So when the sentencing judge imposed a life sentence on the conspiracy, he was doing it based upon the concept that there was a murder, which the record shows did not exist. In addition, Your Honor, there's no evidence. The murders happened, but Mr. Harville and your client, you would say their participation was too attenuated to hold them responsible in any way for it. I mean, we had two young people, a 14-year-old who died in a hail of bullets, in which Mr. Harville was trying to participate and which your client was eager to have gone. Yes, Your Honor. I have no doubt that this was a horrible situation that occurred. But the question is, was Mr. Anastasio guilty of aiding and abetting in a murder? And in order for him to have aided and abetted in a murder, he would have to have done something to facilitate that. There is some language in Rosamond that suggests that your presence and encouragement of an activity of a crime can't be enough under Section 2 to constitute aiding and abetting. Would you agree with that? Or is something more required by both federal and New York law? I think something more is required. I go back to the United States v. Persico, which says that he has to participate in some active way. Just being present does not encourage him. Plus, he's not in a position of egging them on in any way. The record is very clear that he did not participate in the planning. All of the cooperating witnesses who testified about it did not have him participating in any aspect of the planning. Mr. Thurman testifies that when he was asked if he discussed the planning with Mr. Anastasio, he testified, no, really nothing. And Mr. Caraccio, if I'm pronouncing his name right, he testified that he remembers that the planning was done by people who had guns. And Mr. Anastasio did not have a gun. He did not bring a gun there. He did not have a gun when he was present. There was a moment when he was looking at the gun, and then Mr. Hargill came and took the gun away from him. But he was not—no one testifies that he was involved in any of the planning as to what was going to happen, who was going to go where. He knew what was going to happen, but he was not part of the planning of it. Now, this is a case in which we argue about prejudicial joinder, and I know that the grounds of reversal based on a prejudicial joinder. But this is a case in which Mr. Anastasio was basically run over by the evidence in this case involving other people. There was very little evidence of him being involved in any activity, and most of it was wrong. The prosecutor in the opening statement indicated that the evidence was going to show Mr. Anastasio brought a shotgun to the apartment, and the evidence proved him wrong. He did not bring a shotgun. Then they began to kind of rush around and try to come up with another theory, and they came up with this idea that somehow he handed the gun to Mr. Hargill, and that was enough. Mr. Tomei, wasn't there also evidence—this is Judge Carney—wasn't there also evidence that he had participated in some way in the beating up of, I think it was Stephanie Maldonado and her boyfriend, kind of a different gang activity? Well, that— There was the vaguest of evidence on that, Your Honor. Basically, he was present, and someone testified, we all beat him up. And then they said, well, was this guy present? Yes. Did he help? Yes. So under the standard that we have to apply here, that we have to give all inferences in favor of the government and give all credibility in favor of the government, there's the slightest bit of evidence. But that did not carry over to the planning of the actual shootings. There's testimony from cooperating witnesses as to what Mr. Anastasio was doing in the apartment, and they testified he was listening to music. And this is an apartment that we know had several rooms. There were people coming and going. It was not as if they all gathered together and had a planning session. They came into this apartment. Different people came at different times. They came for different purposes. Certainly, there were people like the individuals referred to as the Zulu boys who came in for one purpose and one purpose only, and now would participate in the shootings. And then there were other people who were there. And, look, Mr. Anastasio may have said he wanted to go, but having the desire to go doesn't equate to eating and abetting. Counsel, your time has expired. Thank you, Your Honor. I reserve three minutes for rebuttal. We'll hear from the government. Thank you, Your Honor. Monica Richards, United States, the FLE in this matter. Counsel, you have 20 minutes. I hope you will discuss the defendants in the same order that they argued to us. Oh, okay. Yep, I can do that. Sure. Thanks. It would be helpful. Okay. So, first, regarding Scott Green, who argued first for Mr. Delgado. He argued before this court mainly regarding the sentencing and acknowledged that this was not a topic of conversation at the time of sentencing, the issue regarding that Miller was not raised to the district court. What was before the district court was the TSR, which certainly had notification of the district court had set for the trial. The district court was well aware of the teenage status of the defendant. But the district court never grappled with Miller or the age of Mr. Delgado. I read the sentencing. It was much more mechanistic about how they arrived, how the judge arrived at the final numbers. He never was, as far as I could tell in reading the transcript, grappled with the age of the defendant. Well, I disagree, Your Honor. I think he did acknowledge, specifically with regard to Mr. Delgado, that at the outset, at the time of the murders, he was underage, but then he indicated that this was a conspiracy and that we talked about and that the other things that he did after achieving the age and he cited the things that happened almost immediately after, but happened in May. And then subsequently, there were further activities, such as robberies and shootings that continued right up to the state when he was arrested, when he had an AR, when he had the assault rifle. So there are tracks for outlines. This is Judge Cardi. Would you say actually that what the district court did and recited its considerations was equivalent to a finding of incorrigibility, such as Miller contemplates? Well, no. I mean, Miller's just wasn't applicable here. Miller was not. The situation here was that Miller was not applicable. Miller related to mandatory sentences and related to people who were under the age of 18 at the time. What this was, was a conspiracy that spanned the coming of age from 17 to 18. And so Miller just simply had no place here at the time of this sentencing. I understand the court's concerns, certainly since that time that we've had other decisions, such as Montgomery. And now what I would, I'm sorry. Yes, please go ahead. Oh, sorry. So what I would actually point out is that looking, it was already mentioned that the case that was recited, that was cited in the reply brief, the Malvo case, which has now been withdrawn by stipulation from the Supreme Court's consideration. But there are two other cases in the Supreme Court's pipeline. They have the name Jones and the docket number 18-1259 is the first case that will be heard. And then there's a second case, Briones, B-R-I-O-N-E-S, that's 19-720. And my understanding is that the government has asked the court and Briones to hold that case pending the decision in Jones. So there we would have a determination from the Supreme Court regarding discretionary sentencing. But we still have the age and then also in consideration with the subsequent thoughts and developments with regard to age of the defendants. And so were the court inclined to hold this case in advance pending those decisions, the government wouldn't object to that. I'm not sure that the court needs to because at the time of this sentencing, as I mentioned, Miller was not applicable. This is discretionary sentencing with regard to defendants who would reach the age of majority during the course of the conspiracy. So I'm not suggesting the court do it, but it's a possibility in my defending cases. Moving, unless there's further questions with regard to Mr. Delgado and the sentencing issue, I would move then to Ms. Meyers' client, Matthew Smith. Matthew Smith was acting intentionally. There is certainly evidence that he knew that they were out to shoot at people and that when he went to the home, he was, as indicated in the record, at 2465.47 through 2465.48. When Smith showed up, they all had the guns. They'd already been distributed. They had their guns, and he said he would go see who was out, and he called back minutes later to say that there were people, in fact, out on the porch on Pennsylvania. Now, he was wrong about who those people were and their relationship to the 7th Street, but when he pulled up, yes, they had their guns. The guns had been distributed. I don't disagree with that, but that was the point. When he pulled up, everybody had their guns, and they were getting into cars, and he called and told them where to go. So to say then, in that context, taking those full facts, they're out there, do what you got to do, knowing that they had guns, and they got what they deserved is what he said afterwards, knowing that they'd been killed. I don't see how the record shows anything other than that Mr. Smith knew precisely what had happened. Having told Luis Reyes they're going to go out there, they're going to retaliate for Kiki. All those things in that moment regarding the shooting, but let alone the things that happened beforehand. He was part of the group that was at the park that beat up the suspected members of 7th Street and the park. There was a call out then while they were at the park, hey, everybody wants to participate, show up at Thurman's apartment, and Smith was one of the people who showed up at Thurman's  He wanted to retaliate. He wanted to be involved. And while at the park, James Foxworth said, I'm sorry, James Foxworth said, whoever's going to go out and participate, meet up at the apartment and get guns. And that's reflected in Sam Thurman's testimony at 2465.32 of the Smith appendix. So all those things in that context, I don't see that there's any way that Mr. Smith, I'm sorry, I do see that the jury's verdict here was based on the evidence, and it was reasonable for them to have concluded, as they did, that Smith intended and was acting intentionally that night, and that resulted in the murders of two people, one, a younger person and one an older person, 40-year-old, and neither of them had anything to do with it. So in that sense, I disagree fully that the record does not support the verdict against Mr. Smith. Unless there's questions about that, I would move on to Mr. Lopez, Mr. Burl of arguments. Continue. Thank you. With regard to Mr. Lopez, he did indeed drive the shooters through the scene. But what's more, he also drove a lookout, Mr. Yancey, and Yancey testified to that. There was plenty of testimony that was not contradicted in the record that Lopez was the driver. He had been at the hospital the night of the shooting. He followed the ambulance to the hospital, was present at the hospital while the others were at the apartment, but then he went to the hospital—I'm sorry, to the—I keep saying that. I'm sorry. He went to the apartment and picked up Mr. Yancey, dropped him off so he could be a lookout and tell the people, look out for where they should be going, and then drove the shooters. And it wasn't a matter of—he didn't have his blinders on and his earphones on while he was doing it. He wasn't—he was in the car with four gentlemen who had guns, as was noted already. And the discussion regarding where to go didn't just include where he was going to drop him off, like he was going to just drop him off on a street corner. They first were directed to drive by Pennsylvania, to drive by the home where the porch was, where everybody was out for the evening. And he drove by that porch first before he dropped him off. And while in that vicinity, that's when he said, don't shoot out from the truck, as Judge Jacobs noted. That was a testimony of Mr. Corchado Jameson. The discussion while they drove by also included, hey, who's there? Does that look like them? Who knows who that is? Can anybody tell me who's there? And that was discussed in other people's testimony as well. But Corchado Jameson said there wasn't a lot of conversation. But when they got to Pennsylvania, they certainly were talking about who was out, who was there, and the plan being they were going to be dropped off. But obviously, they could go back and do what they had to do, in the words of the other defendant. So here again, the jury's finding was rational. It was reasonable based on all the evidence used in the light most favorable to the verdict that when Mr. Lopez was out there driving around, she knew exactly what was going to happen and intended it to happen. And with regard to the rest of Mr. Lopez's claims and proficiency, the 924C claim, Mr. Lopez, there was testimony, and I can see that it wasn't a ton of testimony, but there certainly was testimony in the record, again, through Sam Thurman, the Smith Appendix 2364 to 65, and the Smith Appendix, again, 2855 to 56, that Mr. Lopez was somebody who brought a .38 revolver to the park that he showed off to other gang members. He had it at the park. And we know that somebody having a gun at that age, somebody walking around with a gun, dealing in drugs, that's the purpose. That's why they have the gun. So the nexus there is really indisputable based on that testimony of Mr. Thurman and Mr. Cortado Jameson. That's addressed in my brief at page 72. With regard to the other aspects of the RICO conspiracy, the same is true, that everybody knew, everybody who was involved in this gang knew what it meant to put in work. They knew what the different roles were. If you worked your way up the chain, and the horrible result here was there were, there were multiple murders, and there were multiple shootings that resulted in injuries. And that can't be discounted, that Mr. Lopez was involved in that. So that he, in fact, Mr. Lopez himself was shot at, as discussed in my brief, at pages 73 to 74. And he himself was shot at. And that resulted in retaliatory action by other 10th Street gang members, Kyle Egan, Derek Yancey, and James Foxworth. They actually went out and killed somebody else in September of 2018 in retaliation for the shooting of Lopez. And so again, Mr. Lopez was involved heavily in this conspiracy, and the evidence supported the jury's verdict on that count, on the conspiracy count. I don't think, oh, I'm sorry, on the sentencing. With regard to Mr. Lopez, also raised the same issues regarding sentencing. And I would suggest the same, as I've already said, with regard to Mr. Delgado's issues raised regarding the sentencing, that the charges that did result in life in prison for the vicar charges here were mandatory sentences, that he was of majority at the time that the sentence was issued. And the district court considered, as it had to on the 3553A, the types of sentences available. And here, for the vicar charges, that sentence was available. With regard to count one and the conspiracy, it was a guideline sentence, also of life, but it was not mandatory. That was a discretionary life sentence. And the judge, considering the 3553A factors, did decide to impose that life sentence on count one. Unless there's further questions regarding Mr. Lopez, I would move on to Mr. Anastasio. That's fine. Oh, yes. Okay, thank you. With regard to Mr. Anastasio, here we have also a mandatory life sentence. And it's been stated here today that it was for a crime he did not commit, that he wasn't a shooter. But that's the same for all but one of these defendants, that they were not the shooter. Here, we only had one shooter, Mr. Delgado, and it was his brother who was killed. Mr. Anastasio is not in the same situation as everybody else. I mean, he was enthusiastic, and probably he would have gone along. But he didn't participate as a driver, or a lookout, or a shooter. Oh, I just—  Oh, respectfully— Why he's on a par with the others? He was more involved, frankly. In my account, he was the person who was there when the shooting occurred. He was there next to Kiki when Kiki was shot. He then went to the park. He was part of the Association of People at the Park, who were talking about the initial planning stages of retaliating. We're going to do this. Everybody is mad, so mad that they beat up two people who they walked by, who they just suspected of being 7th Street gang members. It had nothing to do with the shooting. They just thought they were 7th Street— But let me interrupt for a minute. But even if we agree with you that he had the requisite intent, would you agree that to aid and abet the commission of a crime under either federal or New York accomplice law, you have to prove that he did something that actually furthered the commission of the substantive crime? Isn't that correct? Well, I'm looking at the jury instruction. I'm sorry. Go ahead. I want to understand what he did that actually furthered the commission of the crime of murder, particularly because my understanding is that what the government points to is that he relinquished a gun that he was holding in the apartment to Harville, and Harville never even fired a bullet because the firearm was not operable. And so Harville himself didn't murder Young or McDonald, and I find it very difficult to understand, even granting that Anastasio was eager for the retaliation to go forward, what he did exactly that made him an accomplice under either New York or federal law and subject then to the mandatory life sentence of Vicar murder. What do you point to? I'm looking at the jury instructions, Your Honor. There's that for us in the Smith Appendix, that's pages 54-64 through 54-65, and the jury instructions with regard to that count, to the Vicar count, include the questions that were asked. Did the defendants participate as something that he wished to bring about? And here, as Your Honor has noted, yes, he was, I mean, he was involved from the whole day long. I would just, Ms. Richards, I'd really just like you to point to me to the action that he took that actually furthered the commission of a murder. The action, not the intent, the action. What is the action? That he tried to get guns, that he was somebody who went out and joined in the search for a gun to use for retaliation, that he didn't find one, is true, but then he went back. You need to point to what he did that actually facilitated the actual commission of a crime. And in your brief, I saw you focusing on, as the district court did, that he relinquished holding a gun to his senior in the organization, Defendant Harville. And that gun, it was inoperable. So what was the actual action that facilitated either of the two Vicar murders? His thoughts, again, with regard to that jury instruction, if I could, are that an affirmative action includes... I'd really like you to identify the action. We would have to look at the jury instruction. You have to identify an action. It's my understanding, Laura. Respectfully, Your Honor, it's not a physical action that's required. There's words, acts, encouragement, support, or presence are all listed in the special appendix of page 5466 as things that are indicative of one who is guilty of a Vicar murder. Well, when we look at the statute, Section 2, or look at New York law, there are actions or look at Roseman, for example. While there's some old common law that says mere presence is enough, I find it really hard to believe that being present while people are planning without having pointed to any participation in the planning or any suggestion, even words spoken, that that's enough to subject someone to a mandatory life sentence.  He was there, as I've said, all day long. He was involved. He was part of the people at the park. He was scoped in terms of the beating up of the folks just suspected. He went back to the apartment when the direction was, come to the apartment if you want to retaliate, get guns, bring guns. He tried to do that. He went to the apartment. He had a lengthy conversation with James Fargo, which included, I want to shoot. It's in the record at 4484 to 4455. I would say that bears on his intent rather than an affirmative act which facilitated a murder. I disagree, Your Honor. I suggest to the court that it's within the realm of, it's within the very instruction that's given on vicar murders and what the affirmative act includes are not just physical actions. Encouragement is important. I think mere presence isn't enough. Counsel, the more you argue how little is required of encouragement, being around when people are talking about it, wishing to participate but not being able to do it, the more you emphasize how little is required to support the conviction, the more I start to wonder whether the sentence is not constitutionally disproportionate. He hands somebody a gun that doesn't work. He'd like to go but he can't or he won't. So the question is, can this support a sentence of life in prison constitutionally? I have my answer to the court is what the jury instruction was and what's been given in every case has had this sort of a, okay, every, I don't want to get caught for saying every, that's been given and that went unchallenged before the district court. And at this point, again, with regard to this particular defendant who I suggest the court was overly involved, who was not just sitting back watching everybody do this stuff. He was participating. He was supporting. He was encouraging. He was trying his best to get out there and shoot. Well, you can try your best to do something bad, but if you don't succeed, I think we should all be happy about it. I can imagine that he aided and abetted an attempt possibly that Mr. Harville made. But it's difficult for me, again, as Judge Jacobs is pointing out to call that he was a mandatory life sentence. But I will take another look at the jury instructions with your thoughts in mind. If there's no other affirmative act that you can point to. Well, his actions all day, your honor, his actions all day, the totality of the circumstances and his involvement all day long were supportive and did intend that he stopped by his actions to make the criminal ventures succeed. That's another bit of the instruction on that on that count and further. I'm not sure. I do hear your honor's questions with regard to the fact that the gun didn't fire, but I'm not sure. I don't understand. I don't see that in my reading of the case law as something that matters in terms of whether or not this defendant and that and defendant Harville as well were guilty of murder. Well, they didn't shoot him. The gun didn't shoot counsel. He didn't kill anyone. But he intended to. He went by. I mean, they were all we have we have a bunch of we had seven or four other people who were injured. They all acted in concert in planning that. And that's why the Vicar finding the Vicar murder includes the aiding and abetting. And I don't see that that's not proven here. I do see the jury was properly charged. I do see that there was factual support for their finding and that their determination on that issue leaving the light in the most favorable to the government was not unreasonable. And if there's any further questions with regard to sufficiency and Mr. Otherwise, I believe I've addressed each of the matters that was addressed by my opponent. And I would rest on my brief unless there's further questions. Thank you, counsel. Thank you. I will turn to the defense attorneys in order that they argued that green. You have one minute. Yes, Your Honor. And I want to talk about the jury charge issue, which I fear may not have been 100% clear, but yet is unique to Jonathan Delgado. I had requested that manslaughter be read to the jury and more importantly, extreme emotional disturbance because the indictment charged murder in the second degree. Mr. Delgado situation was unique in the sense that his brother had been shot, seriously wounded. He went to the hospital to see him. The evidence showed that he was crying. He was angry. And yes, he wanted retaliation as well. And of course, we know what the result was. We've been talking about it for the last hour and a half. My point is that the jury was left with only one choice to say yes or no, with respect to murder in the second degree. They were never given an opportunity to consider that there may have been some mitigating factor, such as the extreme emotional disturbance, which led to the jury finding murder and only murder. They could have done that. But then again, I think the court should have instructed that they could have found otherwise that another crime other than murder could have occurred, and it would not have fit into the indictment. And therefore, I believe that based upon that error, the matter should be returned for a new trial. Thank you, counsel. Ms. Myers, you also have one minute for rebuttal. That's fine. I'd like to just briefly mention something about what occurred in the park and what occurred at Mr. Thurman's house. I'm relying upon the same pages that AUSA Richards is. In the park, at 2465.19220, it is clear that at some point in the park, Thurman said to some or others of a 30 to 40 group people that anybody who wants to participate should just come over to his house. There's no indication that my client was nearby heard anything. The only testimony is that Thurman himself meant by that, that whoever showed up was willing to, in fact, participate. So this has nothing to do with what my client thought, but to do with what Thurman was, in fact, thinking. And then referring to what happened in Mr. Thurman's home, on the same pages that the AUSA is referring to, 2645 to 48, it's clear that Smith, in fact, as I've stated, showed up only after the guns were viewed and the men were armed and that all he was told by the men was that they were going out to look for others. So for all those reasons, I think that the evidence was legally insufficient. Thank you. Thank you, counsel. Mr. Verrillo? Yes, Your Honor. You have three minutes. Yes, thank you. I will try to summarize as follows. Mr. Lopez was, at the time of the shooting, 18 years and four months of age. He was not involved in the planning we would submit. The government's closing argument had argued that possession of a firearm is a 924C violation by the defendants possessing firearms. That obviously was incorrect. There are many inconsistent statements between the defendants, and I did go into quite a bit of detail in my brief about what was testified to. And I think for purposes of a Rule 2033 request, that was a relevant factor, especially since there was, from our position, no independent corroboration of any of the cooperator's testimony. The obvious point being, as I said earlier, about the vehicle, the red Ford Explorer driving by and no one identifying either the vehicle or the defendant. I would submit on all other items that I set forth in my brief, I would ask either for a dismissal of the charges or a new trial. Thank you. Thank you, counsel. And Mr. Tameo, you also reserve three minutes for rebuttal. Mr. Tameo? I'm sorry, Your Honor. I had forgot to turn off the mute. Can you hear me now? Yeah, I can hear you now. Thank you. Great, great. I just want to address the point the AUSA made about the jury instructions. The jury instructions are simply not evidence. If the jury found that there was some sort of, that Mr. Anastasio had taken some sort of action and it's not supported by the evidence, well, that's insufficiency of the evidence, no matter what the jury charge is. And here, the AUSA can't point to anything that Mr. Anastasio did. And I cited to you in my argument and I cited to you in my brief that the people who testified, the cooperating witnesses, all testified he had nothing to do with the planning. And beyond that, Your Honors, I rely on my brief, my written arguments and the arguments to the co-appellants. Thank you. Thank you all. Thank you. We'll reserve decisions on this interesting case. And I will ask the clerk to adjourn court.